Filed 8/6/13  P. v. Coney CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>WILLIAM CONEY,<br><br>        Defendant and Appellant. | B240197<br><br>(Los Angeles County<br> Super. Ct. No. BA375285) |
| In re<br><br>        WILLIAM CONEY,<br><br>        on Habeas Corpus. | B240678, B243237 |

APPEAL from the judgment of the Superior Court of Los Angeles County. Jose J. Sandoval, Judge.  Affirmed in part, conditionally reversed and remanded in part.

ORIGINAL PROCEEDINGS; petitions for writ of habeas corpus.  Petitions denied.

Katharine Eileen Greenebaum, under appointment by the Court of Appeal, for Defendant and Appellant.

William Coney, in pro. per., for Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Roberta L. Davis and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant William Coney was charged by amended information with the sale of a controlled substance (Health & Saf. Code, § 11352, subd. (a)), and with various prior conviction allegations (Pen. Code, § 1170.12, subds. (a)-(d), § 667.5, subd. (b), § 1203, subd. (e)(4); Health & Saf. Code, § 11370.2, subd. (a)).[1] Defendant pled not guilty and denied the allegations. He was granted in pro. per. status on January 7, 2011, and the trial court appointed standby counsel. However, several days after trial started, and after numerous outbursts by defendant, his in pro. per. status was revoked and standby counsel conducted the remainder of the trial. Defendant was convicted by the jury, and following a bench trial on his priors, the trial court found he suffered two strike convictions, and had served a prison term. At sentencing, the court struck the prior strike allegations and sentenced defendant to seven years in county jail, under the Realignment Act of 2011 (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 12, § 1 et seq.).

On appeal, defendant contends the trial court erroneously denied his request for *Pitchess*[2] discovery, and wrongfully revoked his in pro. per. status. Defendant contends any outbursts that led to the revocation of his right to self-representation were justified by his understandable frustration with a number of the trial court's rulings. Defendant has also filed two habeas petitions (case Nos. B240678 & B243237), contending the trial court wrongfully denied a number of his motions, he received ineffective assistance of counsel, and the Sheriff's department deprived him of access to the law library and resources needed for his defense.

---

[1] The amended information also charged codefendant Rufus Mays with one count drug possession (Health & Saf. Code, § 11350, subd. (a)) and one count drug sales (§ 11352, subd. (a)). Mays and Coney were tried together, and Mays has not appealed his conviction.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

2

We agree the trial court erred in denying *Pitchess* discovery and, therefore, conditionally reverse and remand the case for the limited purpose of conducting an in camera review and assessing prejudice in the event that responsive documents are found. In all other respects, the trial court's judgment is affirmed. We also find defendant's habeas petitions have failed to make the required prima facie showing, and therefore we summarily deny them.

## BACKGROUND

### 1. Pretrial Motions

Before defendant's *Faretta*[3] waiver and election to represent himself, his attorney made a pretrial motion for discovery of the personnel records of Los Angeles Police Department Officers Mejia, and Valencia, and of Detectives Miller, Baley and Reyes. The trial court denied the motion.

After defendant executed a *Faretta* waiver and the court granted his request to represent himself, defendant made a number of motions. He moved to suppress the evidence against him, on the basis police submitted false reports and planted evidence. That motion was denied. Next, defendant requested a ruling on a motion for severance which had been filed by his attorney. The motion was denied. When defendant asked why the motion was denied, the trial court responded, "I don't believe you've given sufficient basis to grant the severance." When defendant asked about oral argument, the trial court responded, "I don't need any oral argument."

There appeared to be some confusion about whether defendant had waived time for trial. On January 31, 2011, the trial court indicated defendant had not waived time for trial, and set trial for February 1, 2011. However, on February 1, 2011, the trial court found good cause to continue the trial so codefendant Mays could obtain some lab results. On February 22, 2011, defendant filed a motion to dismiss for violation of his speedy trial rights. The trial court denied the motion, finding "defendant has waived time . . . ." Defendant argued he had not waived time. (The court may have

---

[3]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

misspoken, as it does not appear defendant waived time, but rather the court continued trial after finding good cause for a continuance.) On February 28, 2011, defendant again sought dismissal for violation of his speedy trial rights. That motion was denied, and the trial court found good cause for another continuance.

Defendant also filed a motion for disqualification under Code of Civil Procedure sections 170.3 and 170.6, a motion for ancillary funds for his defense, and two motions to dismiss for *Brady*[4] violations. The court awarded defendant additional funds for his defense. The court denied the section 170.6 motion as untimely, and issued a written order striking the statement of disqualification under section 170.3 for failing to state sufficient facts. At a later hearing, defendant stated he had not received the trial court's response to his statement of disqualification under section 170.3. However, the trial court correctly noted it had ruled on it, and ordered the clerk to provide defendant with a copy of the order. As for defendant's *Brady* motions, the trial court found "the People have addressed the *Brady* issue."

## 2. Trial Evidence

On August 25, 2010, Officers Mejia and Valencia were watching the area near the intersection of 6th Street and Gladys Avenue in Los Angeles for drug activity, working as part of an undercover task force. Officer Mejia, using binoculars, saw codefendant Rufus Mays talking to Jose Ortiz-Pena.[5] Ortiz-Pena handed Mays money, and the two walked across the street to a gray truck, where Mays reached into his pocket and withdrew a "rock-like" solid resembling cocaine base, and handed it to Ortiz-Pena. Ortiz-Pena then drove away in the truck.

Officer Mejia radioed other task force members, gave them a description of Mays and Ortiz-Pena, and ordered they be detained. Officers Munoz and Marshall

---

[4]     *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

[5]     Ortiz-Pena was not tried with Mays and defendant, having entered into a plea agreement.

4

stopped Ortiz-Pena as he was driving away. When Officer Marshall asked Ortiz-Pena if he had any drugs, he responded, "Yeah." Officer Marshall searched Ortiz-Pena, and found an off-white solid resembling cocaine base in his pocket.

As Detectives Miller and Baley responded to 6th Street and Gladys Avenue, they saw Mays walking along 6th Street. They could not stop to detain him, so Officer Mejia drove to the area, and saw Mays hand defendant some money. Mays and defendant were on the corner of 6th Street and Stanford Avenue. Defendant, who was sitting on the curb, grabbed a cup that was on the sidewalk, removed some off-white solids from a bindle that was in the cup, and handed them to Mays. Defendant put the bindle back in the cup and put the cup back on the sidewalk.

Officers Gramillo and Alvarado, and Detective Reyes, responded to Officer Mejia's radio call and approached Mays as he was walking away from defendant. Detective Reyes saw Mays toss some off-white solids onto the sidewalk as the officers walked up to him. Detective Reyes retrieved the discarded substance and placed it in a Ziploc bag. Officer Gramillo tried to handcuff Mays, but Mays was uncooperative. Officer Gramillo told Mays to be still, but Mays did not comply and reached for his side. Officer Gramillo struck him in the torso and conducted a patdown search. She found a glass pipe in his pocket.

Officer Mejia told Detectives Miller and Baley to detain defendant. As they approached him, defendant tried to conceal the paper cup between his legs. Detective Miller searched defendant and recovered the cup. It contained a plastic bindle with a substance resembling cocaine base. Detective Miller also found two $10 bills, six $1 bills, and a glass pipe, in defendant's pocket.

Criminalist Buffy Miller testified the substances recovered by police were cocaine base.

John Green, a forensic expert, testified for the defense. Green testified he was unable to recover any usable fingerprints from the paper cup found on defendant, or from the glass pipe found on Mays. He also attempted to lift prints from the glass pipe and bindle recovered from defendant, but was unable to do so.

5

Anne La Jeunesse, a private investigator for the defense, also testified. She investigated whether there were any video cameras near the crime scene, and served subpoenas on the SRO Housing Authority to obtain surveillance tapes from the La Jolla Hotel and the Ellis Hotel, which are located on the corner of 6th Street and Stanford Avenue. She never received any videos in response to the subpoenas.[6]

## DISCUSSION

Defendant argues the trial court erroneously denied his *Pitchess* motion and wrongfully revoked his in pro. per. status. We agree the trial court abused its discretion in denying defendant's motion for *Pitchess* discovery, because counsel's declaration in support of the motion established good cause for discovery of complaints of the fabrication of probable cause, false report writing, false arrest, perjury and evidence planting. We find, however, the trial court did not abuse its discretion in revoking defendant's self-representation, due to his inappropriate and disruptive behavior. Lastly, we find defendant has not made a sufficient prima facie showing in support of his habeas petitions, and accordingly, we summarily deny them.

## 1. *Pitchess* Motion

A party seeking discovery from a peace officer's personnel records through a *Pitchess* motion must comply with Evidence Code sections 1043 through 1047. "[T]he *Pitchess* motion must describe 'the type of records or information sought' (Evid. Code, § 1043, subd. (b)(2)) and include '[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the

---

[6] During cross-examination, some of the responding officers gave inconsistent testimony on this point. Officer Mejia, Detective Reyes, and Detective Baley testified there was a surveillance camera at 6th Street and Stanford Avenue. Officer Mejia testified it was not a police camera, and he had never used it in his investigations. Detective Reyes testified there was a police camera on 6th Street and Stanford Avenue, but that he did not attempt to secure the tapes after defendant's arrest. Detective Baley testified he tried to obtain footage from the camera on 6th Street and Stanford Avenue, but did not collect any because there was no relevant footage.

6

governmental agency identified has the records or information from the records' (*id.*, subd. (b)(3))." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226.)  The affidavits may be on information and belief and need not be based on personal knowledge, but the information sought must be identified with sufficient specificity to preclude the possibility of a defendant simply fishing for helpful information.  (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 85-86.)

To establish good cause, the affidavits must "provide a 'specific factual scenario' establishing a 'plausible factual foundation'" for the moving party's allegation of police misconduct.  (*City of San Jose v. Superior Court* (1998) 67 Cal.App.4th 1135, 1146.)  The factual allegations must be specific, factual, and unambiguous.  (*Id.* at pp. 1147-1148.)  Plausibility is satisfied if a defendant "demonstrate[s] that the scenario of alleged officer misconduct could or might have occurred"; the allegations need not be "reasonably probable or apparently credible." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1016, 1025-1026 (*Warrick*).) Moreover, "[t]he trial court does not determine whether a defendant's version of events, with or without corroborating collateral evidence, is persuasive -- a task . . . tantamount to determining whether the defendant is probably innocent or probably guilty." (*Id.* at p. 1026.)  "A showing of good cause is measured by 'relatively relaxed standards' that serve to 'insure the production' for trial court review of 'all potentially relevant documents.'  [Citation.]" (*Id.* at p. 1016.)

A motion for discovery of peace officer personnel records is addressed to the sound discretion of the trial court.  A review of the lower court's ruling is subject to an abuse of discretion standard of review.  (*City of San Jose v. Superior Court*, *supra*, 67 Cal.App.4th at p. 1145.)

### a.  Defendant demonstrated good cause for an in camera review

Defendant's motion sought the discovery of complaints in the personnel records of Los Angeles Police Officers Mejia, and Valencia, and Detectives Miller, Baley and Reyes, related to "acts of violation of constitutional rights, fabrication of charges, fabrication of evidence, fabrication of reasonable suspicion and/or probable cause,

7

false arrest, perjury, dishonesty, writing of false police reports, writing of false police reports to cover up the use of excessive force, planting of evidence, false or misleading internal reports including but not limited to false overtime or medical reports, and any other evidence of misconduct amounting to moral turpitude within the meaning of *People v. Wheeler* (1992) 4 Cal.4th 284.”

The attorney declaration in support of the *Pitchess* motion recited the following facts: “Officer Mejia prepared a report and testified at a preliminary hearing that on August 25, 2010, at approximately 1600 hours, he was a passenger in a vehicle with Officer Valencia driving. Upon entering the crosswalk of Sixth and Stanford, they both saw defendant Coney sitting on the southwest corner on the sidewalk. While Officer Valencia was in the driver seat, Officer Mejia looked pas[t] the driver’s side window and observed defendant Mays giving defendant Coney a single bill in exchange for an off white sold resembling cocaine that he retrieved from a plastic bindle inside of a paper cup. As Officer Miller approached defendant Coney, he saw him grab the cup and place it in between his legs. Officers Baley and Reyes detained defendant Coney while Officer Miller retrieved the cup. After retrieving the cup, Officer Miller saw a clear plastic bindle containing numerous off white solids or nickel pieces resembling cocaine base.”

Counsel’s declaration further stated: “Upon information and belief, the defense alleges that Officer Mejia wrote a false report, made a false arrest, committed perjury by testifying falsely, fabricated probable cause, conspired with Officer Miller, Officer Valencia, Officer Baley and Officer Reyes to fabricate probable cause to clear the streets of transients. Defendant Coney was sitting on the sidewalk in the heat when a male approached him, gave him some change, and asked him for a cigarette. Defendant Coney took the change from that person and gave that person a cigarette that he had behind his ears. Defendant Coney did not have any narcotics on his person or in a cup next to him and did not hand that person any white solids resembling rock cocaine. Officer Miller planted the paper cup with the nickel sized cocaine inside the cup. Officers Baley and Reyes watched as Officer Miller planted the cup on defendant

8

Coney, but will be siding with Officer Miller's version that it was not planted when Officer Miller did indeed plant the evidence on defendant Coney. Officers Valencia, Mejia, Miller, Baley, and Reyes fabricated the probable cause and evidence against Defendant Coney. While defendant Coney was sitting at the sidewalk and prior to the officers approaching him, several individuals walked by and near him. Furthermore, the defense alleges that Officer Baley lied when he stated there were no additional witnesses other than the two LAPD officers that saw the use of force against defendant Mays. The defense alleges that there were approximately twenty witnesses, some of whom were recording the beating with their cell phones."

The police report appended to the motion set forth additional facts consistent with the officers' testimony at trial as summarized above. The report also stated Detective Baley had canvassed the area, and was unable to locate any witnesses to Officer Gramillo's use of force.

The prosecution conceded the *Pitchess* motion established good cause as to Officer Mejia for "false reporting" but contended that as to the other officers and alleged misconduct, "the Defendant's declaration is nothing but a denial of the allegations of the arrest report [without] any alternative specific factual scenario of the other officers' misconduct."

The trial court denied the motion, finding "it does not appear to me to be a plausible . . . alternative scenario that this large group of officers would have conspired to concoct the probable cause in this case."

Respondent contends the trial court did not abuse its discretion, relying on *People v. Thompson* (2006) 141 Cal.App.4th 1312, 1318-1319 (*Thompson*). In *Thompson*, the defendant sought discovery of the personnel records of 11 police officers who allegedly conspired to frame him for selling drugs. The defendant in *Thompson* asserted that officers stopped him solely because he happened to be in the area where they were working as an undercover narcotics "buy team," and when they determined he had a criminal record, they all conspired to charge him with possession of drugs, recorded money the police had in their possession from earlier arrests, and

9

fabricated virtually all the events preceding and following his arrest. The Court of Appeal found the factual basis for the *Pitchess* motion was inconsistent and incomplete, because defendant did not state a nonculpable explanation for his presence in an area where drugs were being sold, or sufficiently present a factual basis for being singled out by the police. Defendant simply denied the elements of the offense charged. Accordingly, the *Thompson* court found no abuse of discretion in denying *Pitchess* discovery. (*Thompson*, *supra*, at pp. 1317-1318.)

Here, in contrast to *Thompson*, defendant alleged the officers planted evidence on his person. Counsel's declaration alleged Detectives Baley and Reyes watched as Detective Miller planted the cup with a bindle containing drugs on defendant. In addition to denying the statements in Officer Mejia's report, defendant offered through counsel a plausible nonculpable reason for why police singled him out. Counsel stated on information and belief the officers and detectives were conspiring to clear the streets of transients. Defendant appeared to be transient since he was sitting on the sidewalk in the heat, and his sale of a cigarette could be mistaken for a drug transaction. We are not tasked with determining if this version of events is persuasive or credible. (*Warrick*, *supra*, 35 Cal.4th at pp. 1025-1026.) It is not our job to weigh the evidence, or determine the true source of the drugs in reviewing a *Pitchess* motion. (*Warrick*, at p. 1026.)

Respondent contends defendant's declaration is implausible because he did not seek discovery relating to Officers Gramillo, Alvarado, Munoz, and Marshall, who arrested Ortiz-Pena and Mays, and because he did not explain why cigarettes were not recovered either from him or from Mays. However, Officers Gramillo, Alvarado, Munoz, and Marshall responded to a call concerning drug activity by Officers Mejia and Valencia, who witnessed a drug transaction between Ortiz-Pena and Mays, and Mays and defendant. According to the police report, the transaction between Ortiz-Pena and Mays did not occur within defendant's presence, and Ortiz-Pena was arrested by Officers Munoz and Marshall as he drove away from the scene. Officers Alvarado and Gramillo were involved in Mays's arrest, which also occurred outside of

defendant's presence. Defendant would have no opportunity to observe whether drugs were planted on Ortiz-Pena, or to know if the report was false concerning the arrests of Ortiz-Pena and Mays. In short, defendant may have had no reason to believe Officers Marshall, Munoz, Gramillo and Alvarado were involved in the alleged conspiracy. Moreover, the police report appended to defendant's motion reflects defendant's transient status, but is silent as to the status of the other defendants. Defendant's motion was plausible without having to explain why no cigarettes were booked into evidence.

Accordingly, the trial court abused its discretion in declining to search the personnel files of Officers Mejia, and Valencia, and Detectives Miller, Baley and Reyes for complaints of fabricating evidence, planting evidence, false report writing, false arrest, and perjury. However, we conclude the *Pitchess* motion was overbroad as to the other categories of requested discovery. The declaration failed to establish good cause for discovery of conduct constituting moral turpitude. Even though the declaration called into question the truthfulness of the officers and detectives, the request for "any other evidence of misconduct amounting to moral turpitude within the meaning of [*Wheeler*, *supra*,] 4 Cal.4th 284" was overbroad. While *Wheeler* generally holds that nonfelony conduct involving moral turpitude is admissible to impeach a criminal witness, *Wheeler* did not consider the discovery of such evidence in the context of the confidentiality afforded to peace officer personnel records. (*Wheeler*, at p. 295.) Cases that have considered the intersection of *Wheeler* and *Pitchess* have concluded *Wheeler* does not abrogate the good cause requirement of the Evidence Code, and "only documentation of past officer misconduct which is *similar* to the misconduct alleged by defendant in the pending litigation is relevant and therefore subject to discovery." (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1021, 1024 [seeking all *Wheeler* evidence "would effectively abrogate the good cause requirement . . . by permitting fishing expeditions into the arresting officers' personnel records in virtually every criminal case"].)

11

Defendant also failed to demonstrate good cause for discovery of "acts of violation of constitutional rights" and complaints relating "false or misleading internal reports including but not limited to false overtime or medical reports." These categories are "completely untethered either to the factual scenario or to the proposed defenses outlined in defense counsel's declaration." (*Warrick*, *supra*, 35 Cal.4th at p. 1022.)

### b. Proper remedy for *Pitchess* error

The remedy for a *Pitchess* error is a conditional reversal and remand of the case to the trial court to conduct an in camera hearing. (*People v. Gaines* (2009) 46 Cal.4th 172, 180.) If, after reviewing the confidential material in chambers, it is found the personnel records contain no relevant information, the court is to reinstate the judgment. (*Id.* at p. 181.) If, however, it is found on remand discoverable information exists and should have been disclosed, the trial court must order disclosure of that information, allow the defendant an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed. (*Ibid.*)

## 2. Revocation of In Pro. Per. Status

On January 7, 2011, defendant filed a *Faretta* waiver, requesting to proceed in pro. per. That request was granted, and defense counsel was removed and appointed as standby counsel. Over the course of defendant's self-representation, he repeatedly engaged in inappropriate and disruptive conduct. In the interest of brevity, we will confine our discussion of defendant's obstreperous behavior to the proceedings during trial, though examples abound in the various pretrial proceedings. (The discussion below by no means includes all the examples of defendant's contumacious behavior we found in the record; indeed, we have omitted reference to some of the most grievous examples.)

One pretrial example provides the background to explain some of the problems defendant created unnecessarily at trial. At a March 9, 2011 pretrial hearing to address evidentiary issues, the court admonished defendant not to mention Ortiz-Pena during

12

trial (defendant was ordered not to imply to the jury Ortiz-Pena would provide exculpatory testimony). When defendant persisted (he was apparently frustrated Ortiz-Pena was unavailable as a witness), and the court again repeated its order, defendant asked, "Are we looking for the truth or just part of the truth?" During this exchange, defendant repeatedly interrupted and talked over the court, despite the court telling him not to do so.

On March 10, 2011, during jury selection, but out of the presence of the jury, defendant told the court it made "a misstatement of facts . . . in the jury instructions . . . . It was mentioned that there was two co-defendants . . . from my understanding there's three." When the court reminded defendant "we've been through this more times than I care to remember. In this trial right now there are two defendants, Mr. Mays and yourself." Defendant asked "that an investigation be done into what happened . . . ." The court told him, "Sir, we're done, okay. Anything else? On the issue regarding the third gentleman, Mr. Ortiz, we're done." Defendant was argumentative, stating, "We're not done. You denied it, but --" After the court stated "we're moving on," defendant acquiesced.

Later on March 10, 2011, defendant inquired about the status of some transcripts he had requested in support of a petition for writ of mandate. He asked to also receive transcripts for March 9 and 10, 2011, in addition to those the court had already agreed to order from the reporter. The court stated, "That would be denied. I understand your writ -- and it's a reasonable argument on whether or not [the] motion to dismiss should have been granted. I'm perfectly understanding of your basis for filing that motion, but there's nothing --" Defendant interrupted the court, "You've denied every sound motion that I've put forth to the court." When the court tried to respond, defendant again interrupted, stating "Not only sound motions, but legal, binding --" When the judge stated, "I understand that's your view," defendant responded, "Are you above the law, Your Honor?" The court then went off the record.

When proceedings resumed the next day, the prosecutor made a record regarding defendant's conduct, stating "I know the court has admonished all counsel to

13

remain professional at all times, however, Mr. Coney made some under his breath comments to the jury, and I don't know if it made the record or not. At one point, and I wrote them down, he referred to a juror as 'my man', he referred to jurors regarding metro bus as 'lucky dogs', he made comments about his vision problems, pain, mobility. I don't know if this is to garner sympathy, but it's certainly not professional. And his insistence that the DA, or prosecution, is some kind of special friend of the court is not only disrespectful to me as an officer of the court, but to the court as well as the judicial process." The court then asked "all counsel to behave themselves in a professional manner."

When trial commenced, and defendant was making his opening statement, the prosecutor lodged numerous objections to defendant's inappropriate legal arguments. Defendant, apparently frustrated with the objections, asked "does the jury understand anything I'm trying to convey so far?" When the court admonished defendant to not ask questions of the jury, defendant responded "I think everything is being thrown out of whack here." When the court asked him to "move on," defendant responded "I'm just checking signs and symbols to see if there's anything the court might need to recognize to make sure I'm in the right atmosphere to continue." When the court reminded defendant he was making his opening statement, defendant responded, "I thought it was. I'm hoping it is."

A short while later, after sustaining an objection to defendant's statement that "the crooked vindictive undercover cops . . . . [¶] . . . [¶] . . . intended [to rid] certain areas of blacks," the court indicated it was time for the noon break, and informed the jury that defendant's opening statement would resume after lunch. Defendant stated, "I think you see what kind of trial this is about to be. Might as well get the rope --"

When his opening statement resumed, defendant stated "there is one other person important to clearing up some of the quagmire, Jose Ortiz Pena, the third person who was supposed to be alleged to have been in the company of the co-defendant here . . . ." The prosecutor objected, and the objection was sustained.

14

Later in his opening statement, defendant started to argue the law, and the prosecutor's burden of proof, and mention "the Dred Scott case of 1857." The trial court sustained the prosecutor's objection and told defendant, "Let's move on, we've covered this before Mr. Coney, please." Defendant responded, "We didn't cover this." The court said, "Earlier in voir dire. Let's move on, sir." Defendant said, "Well, I think there was an attempt to --" The court interrupted him and said, "Sir, I've ruled. Let's move on." Defendant then went on to say, "Why myself and others seek freedom --" The prosecutor objected, but defendant persisted with his speech, talking over the court. The court admonished defendant "if you're not going to abide by my rules on voir dire or the general rules --" Defendant interrupted the court, "I don't see where that breaks the rules." The court reminded defendant of the permissible scope of opening statements.

Defendant next engaged in a very lengthy cross-examination of Officer Mejia, which spanned three days of the trial. At one point during his cross-examination, defendant asked Mejia to read from a Metro bus schedule. In response to the prosecutor's objection as to the relevance of the questioning, defendant protested it was "very important to the defense." The court excused the jury so the relevance of the evidence could be ascertained outside their presence, and defendant blurted out "Somebody don't want no facts to be brought forth" before the jury left the room. The trial court warned defendant to make "no speeches." As the court and defendant were discussing the relevance of the bus schedule, and the prosecutor and court commented there was no foundation for the schedule, defendant responded, "You're determined to railroad me any way you can, aren't you?" The court assured defendant it was "not trying to railroad [him] I'm just trying to run this trial consistent . . . with criminal procedure and the rules of evidence."

When defendant later asked Officer Mejia whether he had ever been "impeached while on the stand," the prosecutor objected, and the trial court sustained the objection. When defendant persisted by asking, "Do you know what impeachment means?" the court reminded defendant, "I've ruled. Let's move on." Defendant

15

continued, stating, "Now, I'm a layman, but I believe impeachment is when a person has been found lying on the stand." The court reminded defendant to not make any speeches. Defendant said, "[I'm] trying to get clarification, Your Honor." When the court reminded defendant, "Sir, you're the lawyer here, I've ruled," defendant protested "I'm not the lawyer." The court reminded him, "Sir, you're representing yourself." Defendant told the court, "You're the lawyer." He then asked for clarification on the limits of impeachment. The court responded, "Sir, you decided to represent yourself. I'm terribly sorry. I've ruled. Move on. . . ." Defendant protested he thought his questions were proper. The court again restated it had ruled. Defendant retorted, "Okay. Cover it up, if you want, but I'm going to proceed in a different line." The prosecutor moved to strike defendant's comment, the court ordered it stricken, and defendant said, "Strike it all."

At another point when the court sustained the prosecutor's objections during defendant's cross-examination of Officer Mejia, defendant asked whether the court and the prosecutor had "the signals worked out?" The court responded, "Sir, I deeply resent that implication." Defendant responded, "You can resent it all your want, it's true." When the court reminded defendant it was "trying to run this court consistent with criminal procedure . . . ," defendant interrupted and asked, "Consistent with what criminal procedure? What country?" The court reminded defendant to not make any speeches, and defendant responded "This is America. We are under the Constitution, if I'm not mistaken." The court responded, "Sir, that will be enough." Defendant then said, "Okay. You're not the one being falsely accused here."

When defendant asked why Officer Mejia had not detained codefendant Mays immediately after witnessing the first drug transaction, both the prosecutor and Mays's attorney objected, and the trial court sustained the objections. When the trial court clarified the basis of the objections for defendant, defendant argued, "So we have -- Okay. Three district attorneys." The court admonished defendant to not impugn the other attorneys' integrity.

16

On the third day of defendant's cross-examination of Officer Mejia, having endured more disdain, disrespect and disruption than was necessary, the patient and long-suffering trial court finally terminated defendant's in pro. per. privileges.

Defendant contends his right to self-representation was violated when the trial court revoked his in pro. per. privileges and appointed counsel. According to defendant, his conduct did not amount to deliberate obstructive behavior that threatened to subvert the trial, or to compromise the court's ability to conduct a fair trial. (*Faretta*, *supra*, 422 U.S. at p. 834.) Instead, he contends "[t]he trial court made several rulings, remarks and mis-statements of fact before the actual trial began that would have frustrated and disturbed a seasoned lawyer. It is, therefore, understandable that [an in pro. per.] defendant would have responded in an inappropriate manner, believing the trial court was not treating him fairly." We disagree.

"[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (*Faretta*, *supra*, 422 U.S. at p. 834, fn. 46.) "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." (*Ibid.*; *People v. Watts* (2009) 173 Cal.App.4th 621, 629 ["[A] defendant requesting the right of self-representation must possess the ability and willingness 'to abide by rules of procedure and courtroom protocol.'"].) "[A] trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation." (*People v. Welch* (1999) 20 Cal.4th 701, 735 (*Welch*).)

On review, we apply the abuse of discretion standard to the trial court's decision to terminate a defendant's right of self-representation. (*People v. Carson* (2005) 35 Cal.4th 1, 12; *Welch*, *supra*, 20 Cal.4th at p. 735.) "The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.'" (*Welch*, at p. 735.)

17

Defendant's persistent misbehavior and abuse of his in pro. per. status fully supported the trial court's decision. We find particularly unpersuasive defendant's contention that his behavior was warranted by the trial court's rulings denying various pretrial motions, not one of which is challenged on the merits on appeal. Defendant's claim the trial court did not warn him his conduct would lead to a revocation of his in pro. per. status has no merit. The *Faretta* waiver, which defendant signed and initialed, provided: "I understand that I must not act disrespectfully in court. I understand that the Judge may terminate my right to act as my own attorney in the event that I engage in serious misconduct or obstruct the conduct and progress of the trial." Moreover, the trial court endlessly admonished defendant that he had to abide by the rules and respect the judicial process. Defendant was sufficiently warned yet chose to disrupt the trial at every opportunity.

## 3. Habeas Petitions

Because "a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) "An appellate court receiving such a petition evaluates it by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief." If so, the required prima facie showing has been made. (*Id*. at pp. 474-475.) If no prima facie case is made, we will summarily deny the petition. However, if the allegations of the petition, taken as true, establish a claim for relief, we will issue an order to show cause why relief should not be granted. (*Id*. at p. 475.)

We find petitioner has not stated a prima facie claim for relief, and therefore summary denial of the petitions is proper. Defendant introduced no evidence and alleged no facts outside the appellate record in his petitions which would warrant relief. Therefore, the petitions are denied.

**DISPOSITION**

The judgment is conditionally reversed and remanded. The trial court is directed to conduct an in camera inspection of the personnel records of Officer Mejia, Officer Valencia, Detective Miller, Detective Baley, and Detective Reyes for complaints of fabricating evidence, planting evidence, false report writing, false arrest, and perjury. If the trial court's inspection on remand reveals no relevant information, the trial court is directed to reinstate the judgment of conviction and the sentence. If the inspection reveals relevant information, the trial court must order disclosure, allow defendant an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed. In all other respects, the judgment is affirmed. The petitions for habeas corpus are denied.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.